O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVELTY TEXTILE, INC., a California corporation,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>WINDSOR FASHIONS, INC., a California corporation; XTAREN, INC., a California corporation,<br><br>　　　　Defendants. | Case No. CV 12-05602 DDP (MANx)<br><br>**ORDER DENYING MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL**<br><br>[Dkt. No. 18] |

Presently before the court is Defendant Xtaren, Inc. ("Xtaren")'s Motion to Disqualify Plaintiff's Counsel.

**I. BACKGROUND**

Plaintiff Novelty Textile, Inc. is "engaged in the apparel industry as a textile converter of imported and domestic fabrications." (Compl. ¶ 1.) Plaintiff creates and purchases exclusive rights to "unique two-dimensional graphic artworks" that

are primarily used on textiles and garments sold within the fashion industry.  (Id.)  Plaintiff alleges that Xtaren and Windsor Fashions, Inc. ("Windsor") (collectively "Defendants") sold, manufactured and/or distributed fabric and/or garments featuring a design identical or substantially similar to a design to which Plaintiff owns a registered copyright.  (Id. at 4.)  Xtaren is a paying member of the Korean American Manufacturers Association ("KAMA").[1]  (Chong Decl. ¶ 12, Exh. D.)  On or about April 11, 2012, the Law Offices of Jeong sent a cease-and-desist letter[2] to Windsor on behalf of Plaintiff alleging copyright infringement for an apparel product Windsor once sold.  (Kim Decl. ¶ 8.)  Windsor's counsel, Manning & Kass, sent a letter to Xtaren demanding indemnification according to the terms of their purchase agreement.  (Id. ¶ 5.) Attached to the indemnification letter was the cease-and-desist letter sent to Windsor by Jeong's office.  (Id. ¶ 8.)

    Dean Kim ("Kim") is Xtaren's general management assistant.  (Id. ¶ 2.)  Kim states that after receiving the letter from Windsor, he called several of the KAMA attorneys to discuss it.  (Id. ¶ 7.)  Kim made an appointment with Jeong, who was one of the KAMA attorneys, and prior to the meeting realized that Jeong's office had sent the cease-and-desist letter to Windsor.  (Id. ¶ 8.)

---

[1] KAMA appears to be a "non-profit, member based service organization" which offers many services to its paying members, including "Free Legal Consulting Referral."  (Motion to Disqualify ("Motion") 7;  Chong Decl., Exh. C.)  As discussed below, all of Xtaren's Exhibits regarding KAMA are inadmissible translations of the KAMA website into English using Google Translate.  The court therefore does not rely on any of these translated Exhibits except as background.

[2] This letter was not provided to the court.

2

At that point, Kim consulted KAMA and Xtaren management and decided to go ahead with the meeting with Jeong, "since Jeon was KAMA's General Counsel and the consultation was free." (Id. ¶ 10.) Kim asserts that he met with Jeong and told him he was from Xtaren, but did not show him the cease-and-desist letter. (Id. ¶ 11.)

According to Kim:

> [Kim] told Jeong the exact situation except for the actual product in dispute or the company Xtaren had to indemnify. Instead, [Kim] disclosed to Jeong exactly half of the number of units Xtaren sold and exactly half of the price it was sold for and simply stated to Jeong that Xtaren received a demand for indemnification from a retailer for an apparel product that Xtaren sold them.
>
> [Kim] told Jeong that the apparel product that Xtaren sold to the retailer was manufactured by a Chinese company in China and was purchased by Xtaren for sale to third parties. Jeong advised [Kim] that the Chinese company who manufactured the apparel product may be jointly liable, but that it would be difficult for Xtaren to pursue litigation against a Chinese company because of jurisdiction issues and advised [Kim] that the best way to resolve this case was to reach settlement before Plaintiff filed suit.

3

(<u>Id.</u> ¶¶ 12-13.)  Kim may or may not have told Jeong that he was from Xtaren.  (<u>Compare</u> Kim Decl. ¶ 8 ("I told Jeong that I was from Xtaren but I did not show Jeong the actual cease and desist letter."), <u>with</u> Kim Reply Decl. ¶ 9 ("When Jeong asked what company I was from, I told him I was from 'Cal's' and he understood and wrote it down as 'Kar's'.").)

Kim claims that Jeong advised him that the case could be settled for "somewhere between $4,000 to $6,000," and that Jeong would charge $2,000 in legal fees for a settlement, and more to represent Xtaren if it did not settle. (<u>Id.</u> ¶ 14.)

Jeong has no record of a meeting with Kim.  (Jeong Decl. ¶ 5.) Xtaren claims that some handwritten notes from the meeting prove that it took place.  (For the alleged notes, see Jeong Decl., Exh. 1.)  Jeong identified the handwriting as his own, but believes the content pertains to a different case involving Star Fabrics and LA Printex.  (<u>Id.</u> ¶ 8.)  Kim disagrees with that interpretation of the notes.  (Kim Reply Decl., ¶¶ 6-10.)

**II. LEGAL STANDARD**

"The trial court is vested with the power '[t]o control in furtherance of justice, the conduct of its ministerial officers.'" <u>Henriksen v. Great Am. Sav. & Loan</u>, 14 Cal. Rptr. 2d 184, 186 (Ct. App. 1992).  The court's inherent power includes the power to disqualify an attorney.  <u>Id.</u>  The court applies state law in determining matters of disqualification.  <u>In re Cnty. of L.A.</u>, 223 F.3d 990, 995 (9th Cir. 2000).

The starting point for the court's analysis is Rule 3-310(E) of the California Rules of Professional Conduct ("Avoiding the

4

Representation of Adverse Interests").³ It provides, in relevant part, that "[a] member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

In order to prevail on a motion to disqualify, the moving party and former client must demonstrate either: (1) that the former attorney actually possesses confidential information adverse to the former client; or (2) that there is a "'substantial relationship' between the former and current representation." <u>H.F. Ahmanson & Co. v. Salomon Bros., Inc.</u>, 229 Cal. App. 3d 1445, 1452 (Ct. App. 1991).

**III. DISCUSSION**

The threshold question is whether an attorney-client relationship was formed between Jeong and Xtaren. Without such a relationship, there is no basis on which to disqualify Jeong. Defendants offer two sources of an attorney-client relationship. First, they argue that because Xtaren is a paying member of KAMA, and because Jeong is one of several attorneys serving as general counsel for KAMA, Jeong had a "legal, business, financial, professional, or personal relationship" with Xtaren that would make him subject to the disclosure requirements of California Rules of

---

³ The Central District of California has adopted the Rules of Professional Conduct of the State Bar of California, and the decisions construing them, as the governing standards of professional conduct. <u>See</u> C.D. Cal. L.R. 83-3.1.2.

5

Professional Conduct Rule 3-310(B)(1).  Additionally, Defendants assert that the alleged meeting between Kim and Jeong created an attorney-client relationship and involved the transmission of confidential information to Jeong.

**A. Attorney-Client Relationship Based on KAMA Membership**

Defendants have provided evidence purporting to indicate the benefits that Xtaren derives from its KAMA membership.  The court notes, first, that a translation by Google Translate is not sufficiently reliable to make it admissible.  The pages of the KAMA website offered as Exhibits were translated by Google Translate.  (Chong Decl. ¶ 6.)  The translation's unreliability is clear on its face.  Exhibit B to Chong's Declaration gives information on the nonsensical positions "Torture CPA" and "Torture customs," along with "General Counsel."  The court therefore cannot rely on any of the translated website information in determining the services offered by KAMA and its membership benefits.  Even assuming that KAMA does offer, as stated on the website translation, "Free Legal Consulting Referral" (Chong Decl., Exh. C), this is not sufficient to create a relationship that would "substantially affect [the attorney's] representation" of Novelty, absent an actual communication between a KAMA attorney and a KAMA member.

**B. Attorney-Client Relationship Based on Meeting**

The parties dispute whether the meeting between Kim and Jeong took place.  The court finds that even assuming that a meeting took place, disqualifying Jeong in this situation would clear the way for one party to disqualify opposing counsel at will.  Here, Kim knew that Jeong represented the opposing party in this action and

concedes that he withheld this information from Jeong, such that Jeong "had no reason to know of Xtaren's indemnification clause with Windsor or that [Kim] was in receipt of the letter Jeong sent to Windsor." (Kim Decl. ¶ 11.) Kim may well have received bad advice from KAMA and Xtaren's management which led him to consult with Jeong, but the fact remains that he went into the meeting with Jeong knowing that Jeong represented the opposing party. In that meeting Kim withheld from Jeong the information that would have triggered Jeong's duty to consider conflicts of interest. In such circumstances, disqualifying Jeong does not protect a client from an attorney's conflict of interest because the client has knowingly created the conflict. If a client knowingly creates a conflict of interest, he cannot then ask the court to protect him from himself by disqualifying the innocent attorney.

The court is aware that Kim is not an attorney and that English is apparently not his first language. If Kim had in fact innocently disclosed significant confidential information, the court might attempt to craft a solution to preserve the client's interests. In this case, however, Kim intentionally altered the facts of the case that he was presenting to Jeong, demonstrating that he had some sense that he should not be giving Jeong certain information and reducing the likelihood that he actually communicated confidential information.

Although under normal circumstances a preliminary meeting between an attorney and a potential client creates a confidential

7

relationship, where, as here, the client went into the meeting with opposing counsel knowingly and intentionally, it is not appropriate to disqualify the innocent attorney.

**IV. CONCLUSION**

    For the reasons stated above, the Motion is DENIED.

IT IS SO ORDERED.

Dated: March 20, 2013

                                        DEAN D. PREGERSON
                                        United States District Judge